UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

In re:

Macedon Consulting, Inc.                                  Case No. 23-10300-KHK
Debtor.                                                           Chapter 11

**MEMORANDUM OPINION**

This matter was before the Court on May 15, 2023 for a hearing on (a) the Motion to Dismiss[1] this case filed by Plaza Office Realty I, LLC ("Plaza Office") and Teachers Insurance and Annuity Association of America ("Teachers" and collectively referred to as the "Lessors") and the Objection[2] thereto filed by Macedon Consulting Inc. (the "Debtor," the "Company" or "Macedon") and (b) the Debtor's Motion to (I) Reject Certain Unexpired Leases of Real Property and Executory Contracts Related Thereto Effective as of the Rejection Date and (II) Abandon Any Personal Property Located at Locations Covered By Such Unexpired Leases,[3] and the Objection thereto.[4]

Counsel for the Lessors and for the Debtor appeared and presented argument and evidence in support of their positions. At the close of the Lessors' presentation, the Debtor moved for a directed verdict, which the Court deferred ruling on until the conclusion of the evidentiary hearing. At the conclusion of the hearing, the Court ruled from the bench, denying the Lessors' Motion to Dismiss and granting the Debtor's Motion to Reject. The Court now memorializes that ruling in this Memorandum Opinion.

**Findings of Fact**

Macedon is a corporation organized under the laws of the Commonwealth of Virginia.[5] The company was formed in 2009 and is an information technology solutions provider.[6] Macedon's revenue is

---

[1] Docket No. 72.
[2] Docket No. 121.
[3] Docket No. 11.
[4] Docket No. 77.
[5] *See* Docket No. 10, page 2.
[6] *Id.*

mostly derived from building custom workflow solutions for commercial and federal government clients.[7]

Between 2009 and the onset of the COVID-19 pandemic, Macedon experienced steady growth in its

revenue and workforce, ultimately employing approximately 130 people and generating revenue of $22

million in calendar year 2019.[8]   In October 2013, Macedon entered into a lease with Plaza Office for

commercial office space.[9]  Then in January 2020, Macedon entered into a lease with Teachers for additional

commercial office space.[10]  The total uncapped amount owed under the Plaza Office Lease is approximately

$9,637,501.[11] The total uncapped amount owed under the Teachers' Lease is $4,753,319.[12]  Combined, the

uncapped Lease obligations total $14,390,820.   The Debtor has scheduled what would ultimately be the

lease rejection claim amounts as capped under section 502(b)(6) of the Bankruptcy Code.[13]

In the second quarter of 2020, as a result of the pandemic, Macedon saw an approximate forty

percent downturn in monthly revenue and also experienced a loss in client work.[14]  Prior to the pandemic,

approximately fifteen percent of Macedon's workforce worked remotely.[15]   At present, in part as a result

of the pandemic, Macedon's entire workforce works remotely and has been reduced from 130 employees

to approximately 74 employees.[16]   As a result of the company's downturn in revenue, reduction in

workforce and the shift to remote working, Macedon determined that it no longer needed the Leases and

the corresponding office space.[17]

Thereafter and throughout what was approximately a three-year period leading up to the petition

date, Macedon attempted to find subtenants and/or assignees for the Leases and other attending Lease

---

[7] *Id*.
[8] *Id* at 2-3; Docket No. 133 (the "Transcript"), 103:9-13; 143:15-23.
[9] Docket No. 122-1, Exhibit 1A (the "Plaza Office Lease").
[10] Docket No. 122-5, Exhibit 2A (the "Teachers' Lease" and together with the Plaza Office Lease, the "Leases");
Transcript 143-144.
[11] Docket No. 124-33, pg. 65, Exhibit AG ("Davis Expert Report"), Exhibit 4.1.
[12] Davis Expert Report, pg. 67, Exhibit 4.2.
[13] Docket No. 1, pgs. 25-26, Schedule E/F.
[14] Transcript 224:16-18; 227:1-7.
[15] Transcript 106:5-7.
[16] Transcript 106:8-10; 231:19-21.
[17] Transcript 104:20-25; 105:1-4.

obligations but was ultimately unsuccessful in doing so.[18] At one point Macedon was close to securing an assignment of one of the Leases, but because it was not willing to provide a letter of credit in connection with the transaction, the affected Lessor was not willing to provide a necessary consent to the assignment.[19] From the record before the Court, it appears Macedon engaged in good faith negotiations with its counterparties and that those counterparties likewise engaged in good faith negotiations, notwithstanding the failure to agree to terms at the conclusion of those negotiations.  Following the failed negotiations, Macedon requested termination of the Leases and offered the Lessors what amounted to three months of rent plus the rejection damages that would be owed under section 502(b)(6) of the Bankruptcy Code.[20]

Between 2021 and 2022, Austin Rosenfeld, the principal of the Debtor, received approximately $5.35 million in distributions from the Debtor of which $1.58 million was owed to pay income taxes, and the remaining $3.67 million represented profit distributions.[21]  Mr. Rosenfeld testified that he mostly takes distributions when he has a tax payment that is due and that he otherwise takes distributions of profit from the Company when he identifies an investment opportunity and for his salary.[22]  Mr. Rosenfeld testified that Macedon is an "S corporation," so he reports all profits from the Debtor on his personal income tax returns whether or not he takes any profits out of the company in a given tax year.[23]  Mr. Rosenfeld also testified that aside from tax obligations that were paid, the other "three million or so," he generally left in Macedon as retained earnings.[24]  He  further testified that although Macedon had planned to use the retained earnings to expand the business by acquiring a competitor, it was never able to find a suitable business to purchase.[25]

---

[18] Transcript 153:10-19.
[19] Transcript 164:1-15.
[20] Transcript 55:18-20; Docket No. 122-10, pg. 2, Exhibit 6.
[21] Transcript 52:3-6; 119:6-9; Davis Expert Report, pg. 13, n 11.  The approximate $105,000 discrepancy between the Davis Expert Report numbers and the $5.35 million Mr. Rosenfeld testified to is reconciled by reference to an additional $105,000 payment made for taxes.  *See* Transcript 120:6-15.
[22] Transcript 133:16-24; 134:1-13.
[23] Transcript 134:14-23.
[24] Transcript 135:17-20.
[25] Transcript 135:21-25.

Sometime around October 2021 when Macedon determined that it would not be able to make a suitable acquisition, Mr. Rosenfeld took a distribution from the retained earnings.[26] Mr. Davis, the financial expert in this case, testified that Mr. Rosenfeld's practice of taking distributions to pay tax obligations was common practice for principals of LLCs and S corporations.  Further, the Davis Expert Report opines that even if Macedon had retained the profit distributions, its reserves would still be insufficient to honor the remaining terms of the Leases and the additional cash would only delay the anticipated liquidity crisis.[27] Mr. Davis testified that if the Leases are not rejected, the Debtor will encounter a cash deficiency in February 2026.[28]  He also testified that failing to reject the Leases now will accelerate the Debtor's cash deficiency going forward which will increase the risk that the Debtor will not be able to absorb future unfavorable variants in the market, and thereby increase risk to the Debtor's employees and customers and the business itself.[29]

On February 28, 2023, Macedon filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code.[30]  That same day, the Debtor also filed its Motion to Reject the Leases[31]  and its Plan of Reorganization[32] in which it proposed to pay one hundred percent of allowed claims (assuming the rejection of the Leases was approved). Thereafter, the Lessors filed their Motion to Dismiss arguing that the case should be dismissed 1) under section 105 of the Bankruptcy Code as an abusive filing; 2) for cause under section 1112(b) of the Code; and 3) for lack of eligibility under subchapter V.[33]  The Lessors have also, in essence, asked this Court to either disregard the two-prong test for dismissal established by the Fourth Circuit's decision in *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989), and alternatively, has

---

[26] Transcript 136:19-24.
[27] Transcript 316:13-17; Davis Expert Report, pg. 13, n 11.
[28] Transcript 236:16-21; 237:3-9. Mr. Davis testified that this cash deficit assumes a minimum $1 million cash balance to fund continuing operations and "absorb fluctuations in receivables and payables and collections," and that he arrived at such a minimum balance by analyzing companies that are comparable to Macedon.  Mr. Davis testified that he determined that on a weighted average basis, such similar companies operated off of approximately $1.4 million in working capital.
[29] Transcript 291:3-20.
[30] Docket No. 1.
[31] Docket No. 11.
[32] Docket No. 13.
[33] Docket No. 72.

asked the Court to create a carve-out from that two-prong test in a circumstance where the debtor is not in

financial distress.[34]  In response to the Motion to Reject, the Lessors merely reiterated their arguments

presented in their Motion to Dismiss.  Both parties indicated at the evidentiary hearing that they would rest

on their papers with respect to the Motion to Reject.[35]

## Conclusions of Law

The Court has jurisdiction over this matter under 28 U.S.C. § 1334 and the Order of Reference

entered by the U.S. District Court for this District entered August 15, 1984. This is a core proceeding under

28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

*Dismissal under Section 105*

The Court first addresses the Lessors' argument that it should dismiss this case using its equitable

powers under section 105, arguing that this case is abusive and filed in bad faith.  The Court will not invoke

section 105 to dismiss this case when a more specific code section - section 1112 - governs dismissal of

chapter 11 cases.  Section 1112 applies in subchapter V cases as well as in regular chapter 11 cases.[36]  This

Court will follow the Supreme Court's guidance from *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,

566 U.S. 639, 645 (2012).  *RadLAX* states, "[I]t is a commonplace of statutory construction that the specific

governs the general."  *Id*. at 645.  Further, as will be more fully explained, the Court is not at liberty to

disregard *Carolin Corp*'s binding command of a two-prong test for dismissal of chapter 11 cases.  Without

subjective bad faith *and* objective futility, dismissal is not proper under this Circuit's binding precedent.

*Dismissal for Lack of Subchapter V Eligibility*

The Court next turns to the subchapter V eligibility question.  The Lessors assert that the Debtor is

not eligible for subchapter V because its noncontingent liquidated liabilities exceed the subchapter V debt

limits of $7,500,000.[37]  The Debtor disagrees arguing that the Lease liabilities are contingent because they

---

[34] Docket No. 72, pg. 18.
[35] Transcript 346:4-9, 13.
[36] *See* 11 U.S.C. § 1181.
[37] 11 U.S.C. § 1182(1).

are not yet owing and alternatively argues that the Court should look to what will be the capped rejection damages in this case to determine subchapter V eligibility.  For the reasons that follow, the Court finds that the Lease obligations are noncontingent and liquidated for purposes of subchapter V eligibility and therefore the Debtor is over the debt limits for subchapter V.

While the parties have not cited to any cases directly on point on this issue, the Court finds that the case of *In re Parking Mgmt.*, 620 B.R. 544 (Bankr. D. Md. 2020) is instructive.  The Court begins by noting that the liabilities at issue in *Parking Mgmt.* were not just liability under leases like we have here, and the question before that court was whether lease rejection claims were contingent or noncontingent.  Instead, *Parking Mgmt.* involved lease rejection claims and liability under a "PPP" loan.[38]  The *Parking* court found that the lease rejection claims at issue were contingent because they required court approval of the rejection (which occurred after the petition date) in order to fix the rejection claim, and therefore, the debtor's liability thereunder.  The *Parking* court also found that the PPP loan liability was contingent in nature because the PPP loan, created under the CARES Act, allowed for complete forgiveness if the borrower met certain conditions.  As the *Parking* court noted, the primary feature of a PPP loan is forgiveness, rendering liability thereunder contingent because it depended on a future event that may or may not occur.[39]  The issue in this case is whether the Court should consider the full liability under the Leases and whether the timing of payments thereunder renders that full liability contingent, or whether the Court should allow the estimated lease rejection damages to control.

While the *Parking* court did not include lease rejection damages in the subchapter V eligibility calculation as those damages were contingent in nature, and did not otherwise analyze the full liability under those leases, that does not mean this Court will ignore the Debtor's existing pre-petition liability under the Leases in favor of post-petition events when determining eligibility.  Further, while the Debtor only scheduled what it considered to be the capped rejection damages under the Leases, that is not the end

---

[38] *In re Parking Mgmt.*, 620 B.R. 544, 547 (Bankr. D. Md. 2020).
[39] *In re Parking Mgmt.*, 620 B.R. at 556; *In re Parking Mgmt.*, 620 B.R. at 560.

of the inquiry, because the evidence before the Court establishes that absent such rejection, the Debtor owes

$14,390,820 under the Leases.  Indeed, the *Parking* court held that post-petition events should not be used

to determine eligibility for subchapter V.  As that court pointed out:

> "In considering whether the [debt] is contingent, the court considers whether "all of the
> events necessary to give rise to liability [took] place prior to filing the petition," or
> whether "liability relies on some future extrinsic event which may never occur."[40]

This Court agrees with the logic of *Parking Mgmt.*[41]  In this case, the debt at issue is liability under

the Leases, and that liability arose pre-petition, on the dates the Leases were fully executed.  For example,

it could not be said that if the Debtor vacated the premises on the 31st of one month during the lease term,

that it would not still owe the landlord for the next month and the remainder of the lease term.  While it

may be argued that the timing of payments is the future extrinsic event that may never occur, the Court

disagrees.   The timing of lease payments is simply that - timing.  Absent the end of the world, we know

the future date will occur.  As a result, liability under the Leases must be considered noncontingent and

liquidated, and the Debtor in this case is therefore above the debt limits for subchapter V, which are capped

at $7.5 million of aggregate noncontingent liquidated debts.[42]

The Debtor in its reply to the Motion to Dismiss requested revocation of the subchapter V

designation in the event the Court finds Macedon to be ineligible and asserts that dismissal would not be

the proper remedy for such ineligibility.  The Court agrees.  This Court has previously revoked a subchapter

V designation where the debtor was ineligible, and so has the bankruptcy court for the District of

Columbia.[43]  It seems that the only parties who would be better off from a dismissal of the case would be

the Lessors; however, the Court is required to consider the effect of dismissal on the estate and other

stakeholders as well.  In this case, the Court does not see how these other stakeholders would be better off

---

[40] *In re Parking Mgmt.*, 620 B.R. 544, 556 (Bankr. D. Md. 2020) (internal citation omitted).
[41] The Court agrees with the proposition that post-petition events should not control the question of eligibility, but disagrees that a court should look to rejection damages (as opposed to the existing pre-petition liability under the lease) to measure whether a Debtor is eligible for subchapter V.
[42] 11 U.S.C. § 1182(1)(A).
[43] *In re Berkson*, Case No. 22-10825, Docket No. 113; *In re Nat'l Small Bus. All.*, 642 B.R. 345 (Bankr. D.D.C. 2022).

with a dismissal.  As a result, the Court will revoke the subchapter V designation in this case, in essence

converting it to a regular chapter 11 case.  Conversion means the Court need not reach the Debtor's

invitation to apply a standard other than the Fourth Circuit's *Carolin Corp* standard to the case.

*Dismissal under Carolin Corp.*

The Court now turns to whether the Lessors have shown that the Debtor filed this case in subjective

bad faith and that the case is objectively futile. As previously stated, the Fourth Circuit's standard for

dismissing a chapter 11 case for lack of good faith requires that both objective futility and subjective bad

faith be shown.  In *Carolin Corp.* the Fourth Circuit explained,

> This means that if the only question raised is whether a reorganization is realistically
> possible, i.e., if there is no question of the petitioner's subjective good faith in filing,
> threshold dismissal of a petition is not warranted. In those circumstances the question of
> ultimate futility is better left to post-petition developments. By the same token, even if
> subjective bad faith in filing could properly be found, dismissal is not warranted if futility
> cannot also be found.[44]

Lessors' counsel readily admitted in response to the Debtor's motion for a directed verdict that the Lessors

had not made a showing under the objective futility prong, but instead rely on the Debtor's previously stated

"*Carolin Corp*-alternative" theories for dismissal.[45] Here, the Debtor has already proposed a 100%

repayment to creditors (when accounting for rejection of the Leases).  While there may be some tweaks to

that plan hereafter, the Court cannot find that the restructuring in this case is objectively futile.  Putting

aside the Lessors' fatal failure to prove objective futility, the Court will now address the Lessors' showing

on subjective bad faith.

The Court notes that it found Mr.  Rosenfeld to be a credible witness who gave clear and consistent

testimony.  The Court also notes that the documentary evidence (particularly the various email chains)

submitted in this case did not provide much aid in the decisional process.  It is clear from Mr. Rosenfeld's

testimony that the events precipitating this bankruptcy filing were multi-faceted and that Macedon's actions

---

[44] *Carolin Corp. v. Miller*, 886 F.2d 693, 700–01 (4th Cir. 1989).
[45] Transcript 213:19-22 ("I did not put on any evidence on objective futility because my argument to the Court in our
motion, Your Honor, was that that prong of Carolin Corporation should be revisited by the courts.").

in response to those events were not done with subjective bad faith toward the Lessors, nor were they designed to be an abuse of or improper use of the Bankruptcy Code.

First, the Lessors have asserted that Mr. Rosenfeld's various distributions from the Company prior to the filing were evidence of his bad faith. The Lessors essentially assert that the principal was looting the Company. The Court finds that assertion to be without evidentiary support. The testimony and evidence before the Court establish that Mr. Rosenfeld took various distributions from the Debtor as compensation and in order to satisfy tax obligations that he incurred as a result of operating the business. No evidence was presented to establish that these distributions were made for anything other than compensation and the payment of taxes. In fact, the evidence establishes that Mr. Rosenfeld stopped taking distributions to build up a war chest of retained earnings in preparation for acquiring a competitor and profits were taken only after an acquisition target was not identified.[46] The evidence does not establish that these distributions were taken in order to machinate artificial financial distress for a bankruptcy filing. On the contrary, the testimony of both Mr. Davis and Mr. Rosenfeld is that the Debtor had a drop in revenue,[47] that the Debtor had leased space that became burdensome to its business[48] and that the Debtor would deplete its necessary cash reserves if the course was not corrected.[49]

The Lessors otherwise assert that the Debtor filed this case in bad faith solely to invoke the cap on rejection damages under section 502(b)(6) of the Bankruptcy Code. Lessors have not provided authority indicating that using the Bankruptcy Code exactly as it was intended renders a filing to be one made in bad faith. Mr. Rosenfeld credibly testified that the Debtor attempted to market and sublease the spaces at issue but it was not able to accomplish that goal.[50] There is some dispute between the Debtor and the Lessors as to who was really responsible for the lack of success in the sublease/assignment process, but regardless of where the sticking point was, the Court finds that the breakdown in those negotiations does not indicate a

---

[46] Transcript 135:17-20; Transcript 135:21-25; Transcript 136:19-24.
[47] Transcript 224:16-18; 227:1-7.
[48] Transcript 104:20-25; 105:1-4.
[49] Transcript 236:16-21; 237:3-9; Transcript 291:3-20.
[50] Transcript 153-154.

lack of good faith on the part of Macedon. This Debtor is merely one of many debtors that end up in chapter 11 seeking to reject leases that are burdensome to the estate. This is not the first debtor to exercise such business judgment (see essentially any large retail case) and it will not be the last. Further, Mr. Rosenfeld credibly testified regarding the reduced need for the leased office space given the change in circumstances with the Debtor's customers, the COVID pandemic and the Debtors' employees.[51] Mr. Davis also credibly corroborated that the Debtor will not be able to produce positive cash flow if the Leases are paid according to terms, resulting in approximately nine million dollars in operational losses over the life of the projections in Exhibit 2.0 of the Davis Expert Report. In short, if the course is not changed, the Company will only be able to meet its obligations and maintain necessary working capital through February of 2026. In other words, the company will run out of the cash necessary to operate its business in February 2026 if the Leases are not rejected.

Ultimately, the Court cannot find that the evidence before it establishes subjective bad faith. Instead, the Court sees a landscape of economic uncertainty and a debtor seeking to limit its liabilities and pay its creditors what they're entitled to under the Bankruptcy Code so that it can service its debt, pay and retain its employees, pay trade creditors *and* turn a profit. The desire to do so is not bad faith on the part of the Debtor.

### Conclusion

Based on the foregoing, the Court finds that the Lessors have failed to prove subjective bad faith and objective futility in this case. As a result, the Court will deny the Motion to Dismiss. The Court's ruling on the full merits of the case moots the need for a decision on the Debtor's motion for directed verdict.

---

[51] Transcript 224:16-18; 227:1-7; Transcript 104:20-25; 105:1-4; Transcript 236:16-21; 237:3-9; Transcript 291:3-20.

Finally, the Lessors' sole ground for objecting to rejection of the Leases has been the pending Motion to Dismiss.  Having denied the Motion to Dismiss, and after review of the papers filed by the parties on this issue, the Court will grant the Debtor's Motion to Reject the Leases.  The Court finds the Debtor's decision to reject under the facts of this case demonstrates a reasonable exercise of the Debtor's business judgment.

Separate Orders will issue.

Date:    Jun 14 2023

/s/ Klinette H Kindred

Klinette H. Kindred
United States Bankruptcy Judge

Entered On Docket:June 14, 2023